Daniel J. Anderson (IA Bar No. 20215)
WERTZ, DAKE & ANDERSON
1500 Center St. NE #101
Cedar Rapids, IA 52402-5500
Telephone: (319) 861-3001
Facsimile: (319) 861-3007
danderson@wertzlaw.com

Jessica L. Blome (MO Bar No. 59710) *Pro Hac Vice Pending*
Jeffrey D. Pierce (CA Bar No. 293085) *Pro Hac Vice Pending*
ANIMAL LEGAL DEFENSE FUND
170 E. Cotati Avenue
Cotati, CA 94931
Telephone: (707) 795-2533
Facsimile: (707) 795-7280
jblome@aldf.org
jpierce@aldf.org

David J. Stagman (IL Bar No. 6217440) *Pro Hac Vice Pending*
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile: (312) 577-4416
david.stagman@kattenlaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| TRACEY K. KUEHL, an individual; LISA K. KUEHL, an individual; KRISTINE A. BELL, an individual; NANCY A. HARVEY, an individual; JOHN T. BRAUMANN, an individual; and ANIMAL LEGAL DEFENSE FUND, a non-profit corporation, | Case No. 16-CV-2078 |
| Plaintiffs, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| PAMELA SELLNER, an individual; TOM SELLNER, an individual; and CRICKET HOLLOW ZOO, a non-profit corporation, | |
| Defendants. | |

1.      This case, brought under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544, challenges the unlawful "take" – *e.g.*, killing, wounding, harming, injuring and harassment – of federally listed and specially protected African Lions at the Cricket Hollow Zoo (the "Zoo") by Pamela and Tom Sellner (the "Sellners") and the Zoo (collectively, "Defendants"). The Zoo is a self-described "exotic animals walk-through zoo" and unaccredited roadside menagerie owned and operated by the Sellners. The Zoo contains approximately 300 animals, a number of which are endangered, including the African Lions.

2.      Defendants' operation and management of the Zoo is "taking" the African lions at the Zoo, in violation of the ESA and its implementing regulations. Extensive photographic and video evidence, visitor observations and expert analyses demonstrate that ESA-listed African Lions suffer physically and mentally in their cramped and deprived conditions of confinement at the Zoo.

3.      In June 2014, Plaintiffs Tracey K. Kuehl, Lisa K. Kuehl, Kristine A. Bell, Nancy A. Harvey, John T. Braumann and Animal Legal Defense Fund (collectively, "Plaintiffs") sued Defendants for violating the ESA by "taking" endangered species at the Zoo, including tigers and lemurs. *See Tracey Kuehl, et al. v. Pamela Sellner, et al.*, Case No. C14-2034 (the "Prior Litigation"). On February 11, 2016 – following a four-day trial in October 2015 – this Court entered an Order for Declaratory Judgment and Injunctive Relief ("Order") declaring that Defendants had violated and were likely to continuing violating the ESA by "taking" endangered tigers and lemurs under their care. The Court ordered Defendants to transfer the tigers and lemurs to new homes and to refrain from acquiring listed species at all times in the future.

4.      Just three weeks prior to this Court's Order, U.S. Fish and Wildlife Service listed two additional subspecies of the African Lion under the ESA, thereby according all subspecies of

African Lions protection under the ESA, including the prohibition against "taking" listed species by harassment or harm. 16 U.S.C. § 1538, 50 CFR §§ 17.21(c), 31(a).

5.     Defendants are confining the African lions in small, barren enclosures which disrupt and impair the large cats' normal and essential behavior patterns. The conditions in the African Lions' enclosures are deplorable. Visitors have witnesses a female lion retching in her enclosure, a lioness repeatedly ramming herself into her cage fencing, enclosures strewn with fly-laden meat and feces, and flies feasting on the ears and noses of the African Lions. Defendants are incapable of providing adequate care for the African Lions, including adequate veterinary care.

6.     At least one African Lion has disappeared from the Zoo recently.

7.     Defendants' treatment of the African Lions is an ongoing, immediate concern. Less than two weeks ago, Zoo visitor Jeff Marlin witnessed one male African Lion, who appeared distressed, and one African Lioness, whose condition appeared severe. According to Mr. Marlin, the lioness was shivering, could not stand or walk properly and was panting so hard he feared she was hyperventilating. Mr. Marlin believed she would die, and took video footage of the lioness's suffering. He also observed that there are still flies and feces everywhere.

8.     These inhumane conditions constitute an unlawful "take" of the ESA-listed African Lions. Plaintiffs also bring suit against Defendants for possessing unlawfully taken ESA-listed African Lions.

## PARTIES

### Plaintiffs

9.     TRACEY K. KUEHL is sixty years old and a lifetime resident of Iowa. She has spent the majority of her life in Davenport, where, for the last twenty years, she worked for a

children's museum. From her earliest memories of caring for cows and hogs on her family's farm, she has felt a connection of respect, stewardship and love for animals.

10.     Tracey Kuehl derives personal, recreational, educational and aesthetic benefits from being in the presence of animals and observing animals in humane conditions. She has visited nearly every zoo within 300 miles of the Quad Cities because of her personal, recreational, educational and aesthetic interest in observing animals that she knows she will never get to see in the wild, and because she believes zoos are fun places to go with her friends. She has also visited zoos for events put on by the professional museum organizations of which she was a member. During the zoo visits she learned the importance of a safe and clean zoo experience for both the captive animals and human visitors. She has visited the Blank Park Zoo in Des Moines several times, the Niabi Zoo in Coal Valley more times than she can count, the St. Louis Zoo, Zoo Atlanta, and the Lincoln Park and Brookfield Zoos in Chicago. Tracey Kuehl suffers personal distress when she witnesses animals in conditions that physically or psychologically harm the animals or are otherwise inhumane.

11.     When traveling in northeast Iowa in early 2012, Tracey Kuehl saw an advertisement for the Zoo in a local newspaper. Around the same time, she also heard about the Zoo from her sister, Lisa Kuehl. Because of her interest in observing animals, she visited the Zoo in June 2012. The first thing that struck her when arriving at the Zoo was the stench, which she thought was worse than any hog farm she had smelled. The enclosures and pens containing animals were filled with standing water and accumulating excrement, and there were flies everywhere. Garbage bins were open and garbage was strewn about. Walking through the Zoo, she observed animals who exhibited signs of physical and psychological suffering and who were held in inhumane conditions. She observed bears confined in a small corn-crib enclosure that

4

was sloppy and filled with standing water and feces. She further observed the white tiger in similar conditions, inside a nearly barren cage with standing water and lots of feces lying around; she noted that the enclosure was in major disrepair. Tracey Kuehl also observed a small wire cage containing an albino raccoon draped over a bucket attempting to drink water, with lots of feces accumulating in the corner of the other cage. She also noticed open sores on the face of a ram. As she was visiting other animals, she heard a big ruckus at the lion enclosure. She looked to see the source of the noise and saw a group of older teenagers jumping away from the enclosure as a lion was repeatedly ramming herself into the cage fencing. Tracey Kuehl did not observe any Zoo staff assisting the distressed lion. Tracey Kuehl experienced distress and anguish as a result of the trip to the Zoo and her observations of animals held in unnatural, inhumane and harmful conditions who engaged in abnormal behaviors that indicated psychological distress. The conditions under which the animals were kept at the Zoo seriously impaired her aesthetic enjoyment of the animals.

12.     Worried about the animals at the Zoo and hoping that she had simply visited the Zoo on an "off week," Tracey Kuehl decided to return to the Zoo on July 6, 2012. She saw more of the same conditions—standing water remained and the excrement was similarly piled up in many of the enclosures.

13.     Because she cared about the animals she observed at the Zoo and was concerned about their conditions, health and welfare, Tracey Kuehl began spending significant time trying to improve their situation. She wrote letters of concern to the Iowa Department of Agriculture and Land Stewardship (IDALS) and the USDA. She spoke with two of the Delaware County Supervisors about the conditions of the animals' enclosures. She left messages with the Delaware County sheriff when the weather reached extremes – cold temperatures during the

winter and hot temperatures during the summer – asking for welfare checks on the Zoo animals. In early September 2012, she met with Iowa Secretary of Agriculture Bill Northey, and told him her belief that the Zoo is not the type of "agriculture" that Iowa should be promoting. She also has spoken with Iowa state senators and representatives about Iowa's dangerous wild animal law and its broad exemption for USDA-licensed facilities like Cricket Hollow Zoo.

14.     On June 26, 2013, Tracey Kuehl visited the Zoo to check on the condition of the animals and to see if any changes had been made in the year since her previous visit. She bought what appeared to be dog food at the admission booth and fed the food to a gray wolf through a chute in the fence. She spent time watching the young baboon, the lemurs and the serval, and saw the enclosure conditions were either the same or had worsened. All the enclosures she observed were still filthy and full of water and excrement. She noted that none of the physical objects in the enclosures for the animals to play with – including logs in the lemur, serval and tiger enclosures – had been moved, replaced, or supplemented. In addition, Tracey Kuehl observed that the Meishan pigs did not have easy access to water in their pen. She also looked at the fencing around the enclosures and saw sharp edges, which she feared would hurt either the animals or the visitors. The conditions under which Tracey Kuehl observed the animals impaired her aesthetic enjoyment of the animals.

15.     In October 2013, after learning that three Meishan piglets had died in their enclosure and had not been removed before the facility opened up to the public, Tracey Kuehl wrote letters to the USDA and IDALS asking for investigation into the Zoo. Along with Lisa Kuehl and the Animal Legal Defense Fund, Tracey Kuehl sent a letter of concern to the Delaware County Sheriff and County Attorney.

16.     Because she appreciates and is attached to the particular animals at the Zoo and is concerned about their welfare, Tracey Kuehl wishes to see the animals in humane conditions and to avoid seeing them in inhumane, harmful conditions. Defendants' confinement and exhibition of the animals in inhumane conditions harms Tracey Kuehl's aesthetic, recreational, educational and personal interest in enjoying seeing the animals in humane, safe and psychologically enriching conditions. She is disturbed by Defendants' enclosures and lack of care for the animals at the Zoo. In addition, based on her experience as director of a children's museum and her observations at the Zoo, Tracey Kuehl is concerned about both the animal and human injury and illness, *i.e.* visitor public safety risks from the excessive feces, inadequate enclosure fencing, and uncontrolled public interaction between humans and the animals.

17.     Tracey Kuehl continues to monitor conditions at the Zoo. She frequently visits the USDA's online inspection report database to read about the conditions at the Zoo and she has continued to write letters to the USDA voicing her concern for the animals living there. She was extremely upset when she watched Mr. Marlin's recent video of the lioness's unsteady posture and heavy breathing.

18.     Tracey Kuehl would like to observe and visit the animals currently at the Zoo, including the African Lions and others, living in humane conditions. If the animals were transferred to a sanctuary or other place where they were no longer mistreated and where they lived in humane conditions, Tracey Kuehl would visit them.

19.     LISA K. KUEHL is fifty-seven years old and lives just north of Des Moines. Based upon her youngest memories of growing up on her family's farm, she has felt a connection of respect, stewardship and love for animals.

7

20.     In April 2012, Lisa Kuehl was flying in a plane in eastern Iowa and saw the Zoo from the air. Because of her interest in animals, she decided to visit the zoo in June 2012. Lisa Kuehl experienced distress and anguish from the conditions that she found at the Zoo. She observed Angora rabbits living in chicken coop enclosures with six to eight inches of feces piling up underneath. She saw clumps of black and moldy hay everywhere, and it appeared that Defendants were feeding the hay to the animals. She also observed the lions and wolves covered with flies; looking closely, she saw that flies filled up the interior of the animals' ears. She noted the lions had bite marks from insects, with drops of blood on the lions' faces. The conditions under which Lisa Kuehl observed the animals impaired her aesthetic enjoyment of the animals at the Zoo.

21.     Because she cared about the animals she had observed at the Zoo and was concerned about their conditions, health and welfare, Lisa Kuehl began spending significant time trying to improve their situation. She met with many public officials and organizations to discuss her concerns with the Zoo, including IDALS, Iowa State Veterinarians David Schmitt and Randy Wheeler, and staffers from Blank Park Zoo and the Animal Rescue League of Iowa.

22.     Concerned about the animals, Lisa Kuehl returned in August 2012 to the Zoo. She was upset to discover that the conditions at the zoo were the same as her first visit. She noted that the primates' enclosures were filthy and covered in excrement. She also observed that the primate enclosures, as well as many other cages and enclosures, had very little vegetation or other objects with which the animals could interact or play.

23.     In July 2013, Lisa Kuehl again returned to the Zoo to visit the animals. She found that conditions had not changed from the previous year, with cages in disrepair, food rotting in the heat and obvious presence of rodents and insects. The only difference was that instead of the

baby baboon greeting her as she entered the Zoo – the baboon had been moved to live by himself in isolation, next to the isolated lemurs – she observed a raccoon in the entrance area.

24.     Because she appreciates and is attached to the particular animals at the Zoo and is concerned about their welfare, Lisa Kuehl wishes to see the animals in humane conditions and to avoid seeing them in inhumane, harmful conditions. Defendants' confinement and exhibition of the animals in inhumane conditions harms her aesthetic, recreational, educational and personal interest in enjoying seeing the animals in humane, safe and psychologically enriching conditions. She is disturbed by Defendants' enclosures and lack of care for the animals at the Zoo.

25.     Lisa Kuehl continues to monitor conditions at the Zoo. She frequently visits the USDA's online inspection report database to read about the conditions at the Zoo and she has continued to write letters to the USDA voicing her concern for the animals living there.

26.     Lisa Kuehl would like to observe and visit the animals currently at the Zoo, including the African Lions and others, living in humane conditions. If the animals were transferred to a sanctuary or other place where they were no longer mistreated and where they lived in humane conditions, she would make every attempt to visit them.

27.     KRISTINE A. BELL is fifty-nine years old and a lifetime resident of Iowa. She lives in Ames, where she works for Iowa State University. Bell grew up on a farm in central Iowa and has established a strong connection with animals since her childhood. She kept cats, dogs and horses and other farmed animals.

28.     Based on her interest in and love for animals, Bell visited the Zoo with Plaintiffs Lisa Kuehl and Nancy Harvey in June 2012. She observed animals living in what she perceived to be generally filthy conditions, with open piles of garbage and enclosures and cages caked with feces. For example, Bell observed people buying what looked like dog food to feed to the bears;

9

she noted that when people dropped food through a tube in the bear enclosure, the bears would paw at the food with disinterest. She observed a female lion with flies crawling all over her. As Bell visited the lioness, the animal started throwing up. Bell also observed Scottish cattle, who were crying out to the human visitors. She noted that the cattle did not have any available drinking water and was distressed to interpret the cries to be the animals' expression of their thirst. The conditions under which the animals were kept at the Zoo seriously impaired her aesthetic enjoyment of the animals.

29.     Because she cares about the animals that she visited at the Zoo and was concerned about their captivity conditions, as well as their health and welfare, Bell wrote a complaint to the USDA in late June 2012.

30.     Bell appreciates and is attached to the particular animals she visited at the Zoo and is concerned about their welfare. Defendants' confinement and exhibition of the animals in inhumane conditions harms her aesthetic, recreational, educational and personal interest in enjoying seeing the animals in humane, safe and psychologically enriching conditions. She is upset by the enclosure conditions and lack of care for the animals at the Zoo.

31.     Bell continues to monitor conditions at the Zoo. She was distraught over the news that one African Lion has disappeared from the Zoo.

32.     Bell would like to observe and visit the animals currently at the Zoo living in humane conditions, including the African Lions. If the animals suffering at the Zoo were relocated to a more humane and natural setting, such as a reputable sanctuary where they would receive humane treatment, Bell would no longer suffer impaired aesthetic enjoyment, and would visit the animals again.

10

33.     NANCY A. HARVEY is sixty-three years old and from Ankeny, Iowa. She works as a life insurance underwriter. She and her husband moved to Iowa in 1989 and have lived in the state ever since. She often visits her son in the Quad Cities. Ever since she was a child, Harvey has felt a deep connection to animals, particularly as their caretaker. She believes that the connection is reciprocated because all of her pets – two dogs, two cats and one bird – follow her from room to room throughout her house. Based on her connection to animals, she has visited Blank Park Zoo multiple times.

34.     Because of her interest in observing animals Harvey visited the Zoo with Plaintiffs Lisa Kuehl and Bell in June 2012. While at the Zoo, Harvey was shocked to see the conditions in which the animals lived. Harvey visited the "reptile house" where she observed flies everywhere and a uniform lack of drinking water for most of the animals. What water she saw was filthy, especially for the birds and the chinchillas. Harvey also observed rabbits kept in a small hutch outside and panting in the heat; she used to have rabbits as pets and knows how they suffer in hot temperatures. She noted that the rabbits had matted fur and were soiled with accumulated feces. She observed llamas standing in their own excrement. She saw coyotes pacing back and forth in their enclosure, which to her was abnormal, derived from an apparent lack of stimulation and is a sign of poor welfare. Harvey also observed dogs kept in an enclosure with no water and "food" that was multi-colored, surrounded by flies and did not look edible. She also noted that the hay for the goats and cows was dark and moldy. Most notably, Harvey observed a very thin female lion that appeared sick. As Harvey watched, the lion began to retch and vomit. The lion's eyes looked withdrawn. Harvey was extremely upset watching the lion throw up. She brought the lion's health to the attention of Defendant Pamela Sellner, who told Harvey that the lion was just old.

35.     During the visit, Harvey approached Defendant Pamela Sellner and complained that many animals did not have enough water. Harvey urged Sellner to fill the cows' tank with water, and helped Sellner carry a bucket of water to the dogs' enclosure.

36.     Because she cares about the animals that she visited at the Zoo and was very concerned about their conditions, health and welfare, Harvey dedicated time to try to improve their situation. She wrote a letter of concern to the USDA on June 27, 2012. Along with Lisa Kuehl, she also met with Iowa State Veterinarians to express her dismay about the conditions. Harvey also contacted Des Moines news station WHO TV13 to visit the Zoo and heighten public awareness about the animals suffering at the zoo.

37.     Because she appreciates and is attached to the particular animals at the Zoo and is concerned about their welfare, Defendants' confinement and exhibition of the animals in inhumane conditions harms Harvey's aesthetic, recreational, educational and personal interest in enjoying seeing the animals in humane, safe and psychologically enriching conditions. She is disturbed by Defendants' enclosures and lack of care for the animals at the Zoo.

38.     Harvey was so bothered by what she observed at the Zoo that she emotionally shut down and could hardly function immediately after observing the particular animals at the Zoo. She has since refrained from continuing to visit the animals at the Zoo for fear of again becoming depressed and upset by viewing the animals in their living conditions.

39.     Nonetheless, Harvey continues to monitor conditions at the Zoo. She was distraught over the news that one African Lion has disappeared from the Zoo and she was extremely upset when she watched Mr. Marlin's recent video of the lioness's unsteady posture and heavy breathing.

40.     If the endangered animals at the Zoo, including the African Lions, were relocated to a more humane and natural setting, such as a reputable sanctuary where they would be allowed to live in a species-appropriate environment and receive humane treatment, Harvey would visit the animals again.

41.     JOHN T. BRAUMANN is fifty-four years old and Iowa native. He returned to Marion, Iowa in 2001, where he still lives. He lives about half an hour from the Zoo. Braumann has a deep respect for animals. In 2003 he became a vegetarian because he could not justify killing animals for his own food consumption.

42.     Braumann visited the Zoo in October 2012 and was appalled and disgusted by the inhumane conditions in which the animals lived at the zoo, especially the endangered animals. He noted that flies were everywhere, most enclosures had accumulations of old, dried feces and there were hardly any environmental enhancements in the enclosures. He observed that the tiger enclosure was barren besides one log and a small sleeping area. Upon entering the facility, he met Defendant Pamela Sellner playing with a young baboon, who was in a soiled diaper. Braumann also observed a baby tiger cub, where for twenty dollars the public could pet and play with the cub. He watched a young girl pay for time with the tiger; once she paid, Defendant Sellner left the girl unattended to return to the Zoo's front desk. He also visited the gray wolves and was upset to observe that the wolves had no dry ground in their enclosure; their fur was wet up to their knees, as they had nowhere to avoid the wet, muddy conditions. In addition, Braumann noted that many of the hoofed animals suffered from overgrown hooves, which he knows to be a painful condition.

43.     On July 13, 2013, Braumann visited the Zoo with Lisa Kuehl and found that the conditions of the enclosures had not changed. Flies were everywhere, there continued to be a

13

lack of water and he saw excessive algae in water bowls and debris in food bowls. He noted the baboon, named Obi, was no longer at the Zoo front office, but had been moved to an isolated enclosure next to the isolated lemurs. He also observed a bear in a corncrib enclosure chewing for a very long time on metal stairs.

44. Braumann has since refrained from continuing to visit the animals at the Zoo for fear of again becoming depressed and upset by viewing the animals in their living conditions. His eleven-year-old daughter asked to visit the Zoo with him, but he does not want to expose himself or his family to the conditions of the animals, out of concern of upsetting them. If the endangered animals at the Zoo, including the African Lions, were relocated to a more humane and natural setting, such as a reputable sanctuary where they would be allowed to live in an appropriate environment and receive humane treatment, Braumann would visit the animals again.

45. ANIMAL LEGAL DEFENSE FUND (ALDF) is a national non-profit organization headquartered in Cotati, California with over 100,000 members. ALDF pursues its purpose of safeguarding animal welfare by persistently advocating for the protection of animals used and sold in commercial enterprises. ALDF frequently focuses on animal husbandry practices and the confinement of animals used for entertainment and exhibition purposes. ALDF has expended significant organizational resources on advocacy and public education efforts to improve the welfare of animals–particularly members of threatened and endangered species– that are held in captivity.

46. ALDF brings this action on behalf of its members, including Plaintiffs Tracey Kuehl, Lisa Kuehl, Bell and Harvey. ALDF's members' interests in observing and otherwise

14

enjoying animals at the Zoo have been, and will continue to be, harmed by Defendants' take of the endangered African Lions through their operation and management of the Zoo.

**Defendants**

47.     CRICKET HOLLOW ZOO, INC. is an Iowa non-profit corporation that operates Cricket Hollow Zoo, a roadside menagerie located at 1512 210th Street, in Manchester, Iowa.

48.     PAMELA and TOM SELLNER are citizens and residents of Delaware County, Iowa.   The Sellners are officers of Cricket Hollow Zoo, Inc., and own and operate Cricket Hollow Zoo.

**JURISDICTION AND VENUE**

49.     The Court has jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs allege violations of federal law.

50.     Pursuant to 28 U.S.C. §§ 2201-2202, the Court is authorized to provide declaratory and injunctive relief.   The ESA's citizen suit provision further authorizes the Court to enjoin violations of the ESA and its implementing regulations. *See* 16 U.S.C. § 1540.

51.     Plaintiffs provided notice of their intent to sue Defendants on March 16, 2016, at least sixty days in advance of this Complaint, as required by the ESA. *See id*. § 1540(g)(2)(A). Defendants have not remedied the violations set out in the 60-day notice.   On information and belief, Defendants have not applied for any permit to lawfully take members of federally listed species at the Zoo, including the African Lions.

52.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(e), because Plaintiffs reside in this judicial district and no real property is involved.   In addition, Plaintiffs may bring suit in this judicial district because violations of the ESA occur in the district. *See* 16 U.S.C. § 1540(g)(3)(A).

## STATUTORY AND REGULATORY FRAMEWORK

53.     Congress passed the ESA in recognition that species in danger or threatened with extinction "are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," and that the United States has pledged to the international community "to conserve to the extent practicable various species of fish or wildlife and plants facing extinction." 16 U.S.C. § 1531(a)(3)-(4).

54.     The ESA defines an "endangered species" as "any species which is in danger of extinction." *Id.* § 1532(6). A "threatened species" is any species likely to become endangered in the foreseeable future. *Id.* § 1532(20).

55.     The prohibitions of the ESA apply to endangered or threatened animals bred or kept in captivity as well as those in the wild. *See, e.g.*, Proposed Rule, 79 Fed. Reg. 4313, 4317 (proposed Jan. 27, 2014) ("On its face the ESA does not treat captives differently. Section 9(a)(1)(A)-(G) of the ESA applies to endangered species regardless of their captive status."); 50 C.F.R. § 17.3 (defining the "take" definition's term "harass" in the context of captive animals).

56.     Section 9 of the ESA makes it unlawful for any person to "take" any endangered species of fish or wildlife listed under the Act. *Id.* § 1538(a)(1)(B). Pursuant to the Congressional command that implementing agencies promulgate regulations they deem "necessary and advisable to provide for the conservation of [threatened] species," *id.* § 1533(d), the U.S. Fish and Wildlife Service (FWS) also prohibits the take of species listed as threatened under the ESA. *See* 50 C.F.R. § 17.31(a).

57.     The ESA defines "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The Eighth Circuit has observed that Congress intended for "take" to be defined "in

16

the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." *Defenders of Wildlife v. Adm'r of EPA*, 882 F.2d 1294, 1300 (8th Cir. 1989).

58. Section 9 also makes it unlawful to "possess, sell, deliver, carry, transport, or ship" any endangered or threatened species that has been unlawfully taken in violation of Section 9(a)(1)(B). 16 U.S.C. § 1538(a)(1)(D). In addition, Section 9 makes it unlawful to "deliver, receive, carry, transport, or ship in interstate or foreign commerce…in the course of commercial activity" any endangered or threatened species, regardless of whether the species was taken. *Id*. § 1538(a)(1)(E).

## FACTS GIVING RISE TO THE COMPLAINT

### The Cricket Hollow Zoo

59. Cricket Hollow Zoo is an unaccredited roadside menagerie at 1512 210th Street in Manchester, Iowa. At the Zoo, Defendants confine and exhibit many species of wildlife, including endangered species.

60. Defendants charge the public a fee to view wildlife at the Zoo, and an additional fee to buy what appears to be dog food to feed to the bears, wolves and primates.

61. Over the past decade, the USDA has issued numerous citations and multiple official warnings to the Zoo for violations of the Animal Welfare Act, 7 U.S.C. § 2131 *et seq*. ("AWA"). The agency has twice fined the Zoo several thousand dollars for AWA violations. According to the USDA, the Zoo is in "chronic non-compliance" with the AWA.

62. Many of the AWA violations have concerned inadequate structural housing for the animals, including housing for the big cats. The inadequate housing of dangerous wild animals threatens the safety of the Zoo's visitors and neighbors. The Zoo's animals, including

the African Lions, are often confined in small, barren cages or enclosures, including corn cribs. Defendants lack the resources to make capital improvements to the Zoo.

63.     Defendants also lack the resources to hire staff to adequately care for the Zoo's animals. On multiple occasions, the USDA has cited the insufficient staffing at the Zoo. For example, in August 2011, USDA inspectors found that "there is not a sufficient number of employees" for the 161 animals then at the Zoo and "[t]his does not provide for the health and well-being of the animals." In December 2011, USDA inspectors again cited the Zoo's inability to adequately care for its animals, which Defendants had increased to 179 animals.

64.     Even after repeated warnings and a hefty fine, the USDA again found in July 2013 that "[t]here are not an adequate number of employees at the zoo . . . The staffing level must be increased to include additional adequately trained employees or the numbers of animals must be decreased to the point so the present staff can accommodate the needs of the animals and meet the requirements of the Animal Welfare Act."

65.     Defendants have not remediated these staffing deficiencies. As this Court concluded in its Order, the "Sellners are overwhelmed by the amount of work required to care for approximately 300 zoo animals."

66.     Furthermore, many of the AWA violations have concerned grossly inadequate sanitation for the Zoo's animals, including the endangered big cats. Defendants have repeatedly and chronically failed to timely remove animal feces waste from the Zoo's enclosures, which this Court's Order recognized as constituting a "disease hazard" and falling "below the minimum standard of generally accepted animal husbandry practices for facilities governed" by the AWA. For example, USDA inspectors cited Defendants' failure to remove food waste and animal feces from the Zoo's enclosures in July 2010, November 2010, February 2011, August 2011,

December 2011, August 2012, November 2012, February 2013, July 2013, September 2013, May 2014, August 2014, May 2015 and July 2015. A number of these inspections specifically noted accumulation of feces in or near the African Lion enclosures. Many of these inspections also cited Defendants for excessive numbers of flies, which are capable of transmitting disease.

67. In June 2015, the USDA-APHIS notified Defendants that their license under the AWA was suspended for 21 days for, among other violations, failure to "remove excreta from multiple animal enclosures as often as required."

68. Since the October 2015 trial in the Prior Litigation, the USDA-APHIS has inspected the Zoo on at least three occasions: December 10, 2015, February 29, 2016 and April 14, 2016. (The February 2016 inspection was only an "attempted inspection" because "the licensee . . . had to leave for an appointment.") Once again, the December 2015 inspection cited "multiple enclosures" with a "build-up of food waste and/or animal waste" and the April 2016 inspection cited problems with flies, which "can carry and spread disease."

69. The conditions at the Zoo have not changed since those USDA-APHIS inspections. Indeed, when Mr. Marlin recently visited the Zoo on June 24, 2016, he noted that the enclosures looked the same as they had on his previous visits and that there are still flies and feces everywhere.

70. Defendants also are incapable of providing the necessary veterinary care for the Zoo's endangered animals. On information and belief, approximately fifteen endangered animals have died at the Zoo since 2005. Among these are the untimely death of an African Lion and the untimely deaths of four endangered tigers, who this Court concluded in its Order had been harmed by Defendants' failure to provide timely and appropriate veterinary care.

19

71.     On information and belief, Defendants lack the resources to pay for adequate veterinary care for the Zoo's animal, including the African Lions.  Indeed, the record in the Prior Litigation revealed that Defendants spent less than $700 *total* on veterinary care in 2014 for *all* of the Zoo's animals, or approximately $2.33 per animal.

### The African Lions

72.     On January 22, 2016, the U.S. Fish and Wildlife Service listed two subspecies of the African Lion under the ESA. Fed. Reg. Vol. 80, No. 246 (Dec. 23, 2015), *available at* https://www.gpo.gov/fdsys/pkg/FR-2015-12-23/pdf/2015-31958.pdf (amending 50 CFR § 17.11 to include the subspecies *Panthera leo leo* and *P. l. melanochaita* as threatened and endangered, respectively). Accordingly, as of January 22, 2016, all subspecies of African Lions are protected by the ESA and enjoy the protections afforded to threatened and endangered animals therein, including Section 9's prohibition on the unlawful "take" of listed species by harassment or harm. 16 U.S.C. § 1538, 50 CFR §§ 17.21(c), 31(a).

73.     Defendants admitted in the Prior Litigation, by a June 19, 2015, affidavit of Pamela Sellner, that the "lions at the Zoo have all been African lions."

74.     Defendants do not possess a permit from FWS to "take" the African Lions that are kept at the Zoo.

75.     During their visits to the Zoo, Plaintiffs were shocked to observe the physical appearances of the African Lions and the deplorable conditions of their care.  Plaintiffs have witnessed an emaciated female lion vomiting in her enclosure.  On her first visit, Tracey Kuehl witnessed teenagers taunting a lioness, who was repeatedly ramming herself into the cage fencing.  She saw no Zoo staff assisting the distressed lion.

76.     Plaintiffs also have observed many enclosures strewn with fly-laden meat and feces and, in later visits, flies moving from that food and animal waste to feast on the ears and

noses of the African Lions. Plaintiffs have witnessed insect bite marks on the African Lions and drops of blood on the African Lions' faces.

77. In October 2012, a visitor observed that one of the African Lions had severely protruding hip and spinal bones. At that time, the Zoo kept four African Lions.

78. However, by the following Summer of 2013, only three African Lions were living at the Zoo. On information and belief, one African Lion did not survive the harsh climate while living in the Zoo's inadequate enclosures.

79. According to the USDA's reports and animal counts, three African Lions were living at the Zoo in July 2015. However, the USDA's subsequent reports and animal counts indicated that at least one more African Lion has disappeared from the Zoo.

80. Mr. Marlin corroborated the USDA's animal count during his visit on June 24, 2016, witnessing only one male African Lion and one African Lioness.

81. During his visit, Mr. Marlin observed that both African Lions appeared distressed, and that the lioness's condition looked severe. According to Mr. Marlin, the lioness "just stood in one corner of her cage shivering even though she was in direct sunlight. She also could not stand or walk properly. Both her hind legs were bent as if she wanted to sit, but she seemed to be too sore or agitated to do so. She was panting so hard that I feared she was hyperventilating, but she was too weak to move to the shade. She just looked so sickly, we all thought she would die."

82. Mr. Marlin took video footage of the African Lioness suffering at Zoo. He also observed that there were flies and feces everywhere.

83. Defendants are violating, and have repeatedly violated, the ESA in their "taking" of endangered African Lions and repeatedly have proven incapable of complying with the AWA in their treatment of endangered African Lions.

21

84. Defendants have proven incapable of providing the necessary veterinary care to maintain the health of the African Lions at the Zoo. Indeed, Defendants appear dangerously close to causing the death of yet another endangered big cat, and are incapable of saving the African Lioness's life or providing palliative care to ensure a comfortable and humane death.

## CLAIMS FOR RELIEF

### Violations of the Endangered Species Act

### Count I—Unlawful "Take" of Protected Species

85. Each and every allegation set forth above is incorporated herein by reference.

86. The Endangered Species Act, 16 U.S.C. § 1538(a)(1)(B), prohibits the "take" of "any such species" within the United States or the territorial sea of the United States without a permit, where "such species" include endangered species of fish or wildlife listed pursuant to § 1533.

87. Defendants have violated and continue to violate the ESA and its implementing regulations by taking African Lions within the meaning of 16 U.S.C. § 1538(a)(1)(B), without a permit at Cricket Hollow Zoo.

88. This Court has the authority to issue an injunction prohibiting Defendants from committing further violations of the ESA and to compel Defendants to remedy current violations of the ESA. 16 U.S.C. § 1540(g)(1)(a). Moreover, this Court has the authority to award the costs of litigation, including reasonable attorney and expert witness fees, to any party whenever the court determines such award is appropriate. 16 U.S.C. § 1540(g)(4).

### Count II—Unlawful Possession of Protected Species

89. Each and every allegation set forth above is incorporated herein by reference.

90. The Endangered Species Act, 16 U.S.C. § 1538(a)(1)(D), prohibits the possession, by any means whatsoever, of any species taken in violation of § 1538(a)(1)(B) and(C).

91. Defendants have violated and continue to violate the ESA and its implementing regulations by possessing and continuing to possess unlawfully taken African Lions at the Cricket Hollow Zoo, within the meaning of 16 U.S.C. § 1538(a)(1)(D).

92. This Court has the authority to issue an injunction prohibiting Defendants from committing further violations of the ESA and to compel Defendants to remedy current violations of the ESA. 16 U.S.C. § 1540(g)(1)(a). Moreover, this Court has the authority to award the costs of litigation, including reasonable attorney and expert witness fees, to any party whenever the court determines such award is appropriate. 16 U.S.C. § 1540(g)(4).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that Defendants are violating the ESA by illegally taking endangered African Lions without a permit;

B. Declare that Defendants are violating the ESA by possessing endangered African Lions that have been illegally taken;

C. Enjoin Defendants from engaging in operations and activities that cause take of the African Lions at Cricket Hollow Zoo;

D. Enjoin Defendants from possessing, at Cricket Hollow Zoo, endangered African Lions that have been illegally taken and ordering Defendants to transfer any endangered African Lions living at the Cricket Hollow Zoo to The Wild Animal Sanctuary in Keenesburg, Colorado;

E. Enjoin Defendants from acquiring and/or disposing of endangered African Lions in interstate and / or foreign commerce;

F. Award Plaintiffs their reasonable attorney fees and litigation costs in this action, and;

G. Grant Plaintiffs such other and further relief the Court may deem just and proper.

23

Dated: July 11, 2016

Respectfully submitted,

*/s/ Daniel J. Anderson*
Daniel J. Anderson (IA Bar No. 20215)
WERTZ, DAKE & ANDERSON
1500 Center St. NE #101
Cedar Rapids, IA 52402-5500
Telephone: (319) 861-3001
Facsimile: (319) 861-3007
danderson@wertzlaw.com

*/s/ Jessica Blome*
Jessica L. Blome (MO Bar No. 59710)
*Pro Hac Vice Pending*
*/s/ Jeffrey Pierce*
Jeffrey D. Pierce (CA Bar No. 293085)
*Pro Hac Vice Pending*
ANIMAL LEGAL DEFENSE FUND
170 E. Cotati Avenue
Cotati, CA 94931
Telephone: (707) 795-2533
Facsimile: (707) 795-7280
jblome@aldf.org
jpierce@aldf.org

/s/ David Stagman
David J. Stagman (IL Bar No. 6217440)
*Pro Hac Vice Pending*
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile: (312) 577-4416
david.stagman@kattenlaw.com

Attorneys for Plaintiffs
TRACEY K. KUEHL, LISA K. KUEHL,
KRISTINE A. BELL, NANCY A. HARVEY,
JOHN T. BRAUMANN and ANIMAL
LEGAL DEFENSE FUND

## VERIFICATION

    I, Tracey K. Kuehl, have read the foregoing COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF and declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the information in Paragraphs 9-18 is true and correct.  I authorize electronic signature of this Verification and provide Plaintiffs' counsel with my original signature page.

Dated:  July 11, 2016                               */s/ Tracey K. Kuehl*
                                                  Tracey K. Kuehl

## VERIFICATION

I, Lisa K. Kuehl, have read the foregoing COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF and declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the information in Paragraphs 19-26 is true and correct. I authorize electronic signature of this Verification and provide Plaintiffs' counsel with my original signature page.

Dated: July 11, 2016                  /s/ *Lisa K. Kuehl*
                                           Lisa K. Kuehl

## VERIFICATION

    I, Kristine A. Bell, have read the foregoing COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF and declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the information in Paragraphs 27-32 is true and correct. I authorize electronic signature of this Verification and provide Plaintiffs' counsel with my original signature page.

Dated: July 11, 2016                              */s/ Kristine A. Bell*
                                                   Kristine A. Bell

## VERIFICATION

I, Nancy A. Harvey, have read the foregoing COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF and declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the information in Paragraphs 33-40 is true and correct. I authorize electronic signature of this Verification and provide Plaintiffs' counsel with my original signature page.

Dated: July 11, 2016

/s/ *Nancy A. Harvey*
Nancy A. Harvey

## VERIFICATION

I, John T. Braumann, have read the foregoing COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF and declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the information in Paragraphs 41-44 is true and correct. I authorize electronic signature of this Verification and provide Plaintiffs' counsel with my original signature page.

Dated: July 11, 2016

*/s/ John T. Braumann*
John T. Braumann